Kathy R. MOORE, Plaintiff,

v.

SAM'S CLUB, a division of Wal–Mart Stores, Inc., and Ossie Gee, individually and in his representative capacity, Defendants.

No. 97 CIV. 1318(RPP).

United States District Court,
S.D. New York.

April 14, 1999.

Ross Solomon, New Windsor, NY, for Plaintiff Kathy R. Moore.

Greg Muzingo, Wal–Mart Stores, Inc., Bentonville, AR, Roberts & Finger, LLP by Joel Finger, Patricia LeGoff, New York, NY, for Defendant Wal–Mart Stores, Inc.

Morgan, Lewis & Bockius, by George Stohner, Betsy Floman, New York, NY, for Defendant Ossie Gee.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Now pending before the Court are four motions: (1) Defendant Wal–Mart Stores, Inc.'s ("Wal–Mart") motion to amend its answer pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to include an additional affirmative defense; (2) Wal–Mart's motion for summary judgment on all claims of the Complaint pursuant to Rule 56; (3) Defendant Ossie Gee's ("Gee") motion for judgment on the pleadings pursuant to Rule 12(c) to dismiss certain of the claims against him personally; and (4) Gee's motion for summary judgment, pursuant to Rule 56 (and joined in by Wal–Mart), to dismiss an allegation of rape raised by the plaintiff at her deposition.

1. It is not clear from the record what the difference is between a general manager and

### Background

Plaintiff Kathy R. Moore ("Moore") was first employed by Wal–Mart in 1984 and worked at six different stores in four different states until she left Wal–Mart in 1991 to work for Office Depot. (Def. 56.1 Stmt. ¶ 1; Muzingo Aff. Ex. B at 17.) Moore was rehired by Wal–Mart in November 1995 for a position as the night shift merchandise manager in the Middletown, New York, Sam's Club. (*Id.* ¶ 3.)

At the time Wal–Mart rehired Moore, it had a standing policy against hostile environment and quid pro quo sexual harassment which included a complaint notification procedure, assurances of confidentiality, suggested steps to ensure prompt corrective/remedial action, and prohibitions against retaliation. (*Id.* ¶ 4.) The revised policy, dated December 10, 1995, stated, "It is recommended, but not required, that all complaints be in writing, describing in as much detail as possible" the dates of the conduct complained of, the parties involved, and the complainant's perception of the conduct. (Muzingo Aff. Ex. D.)

On April 25, 1996, Moore complained to Missy McKinley, general manager of the Middletown store [1], and Chuck Miller, Wal–Mart's director of operations, about alleged sexual harassment by Gee, co-manager of the Middletown store. At that time she provided Wal–Mart with a written statement:

> Around the end of March/beginning of April I attended a social gathering at the home of my GM [General Manager]. A situation derived from this night involving the Co-manager who was also at this party and myself. The boundary lines of a professional & personal relationship were overstepped-advancements were made. Nothing was mentioned to anyone else about this at this point to my knowledge or even discussed by the 2 of us. Right before inventory

a co-manager.

the Co-manager was on the closing shift, we were in the office & he ask[ed] me about that night and was making very light of it and tried to make contract with me in the coachs [sic] office.[.]

I pulled away from him and ask[ed] him did he think I was joking when I speak so strongly about-sexual advances in our club and our company policy[.] I had just written a coaching on an individual a few days prior & wanted the Co. Mgr. to understand that the same Rules apply to all of us. My impression was that he really didn't care. This was wrong-I was very uncomfortable being put in that position in the work place & tried to make him realize he crossed the line. He told me that he could respect that-but I never could feel that comfort level & very nervous about being in a situation by myself here at the Club with him. I have made reasons for closing Team Leaders & other coaches to always be in our presence when he would close without really exposing the situation. I wasn't sure exactly how to handle the situations As far as using this Open door with my GM and didn't feel that the time was right-in all that was going on in our club it just wasn't a priority...there was inventory, huge floor moves & other issues this would take the back seat until everything else was back to everyday operations...My G.M. ask[ed] me during my 6 months review what had been wrong with me for the past 2 or 3 weeks that I didn't seem happy. I still didn't use the open door regarding this but did tell her that I would talk to her at a later time[.] We were dealing with other issues having to do with preventing dedicated partners from working off the clock & other things in everyday business. After all of these issues were handled I spoke with her about my fear & discomfort. The Co-manager had been on vacation & would be back on the closing shift, I couldn't go in that night & deal with these circumstances any longer so I told my G.M. everything. I cannot be at my

best for me or the company when these circumstances exist. There have been situations involving "EGO & animosity" between the two of us that have direct reflection on our hourly partners. I get very nervous and ap[p]rehensive around him & can't cope with this type of environment not knowing what to expect. It is threatening to me. I don't want any-one[']s career threatened! I just want to address the situation with him again & have a member of management in our company at the time. I don't want this situation to go any further than in the pres[e]nt company or noted any further than Jeff Wright [Wal–Mart's regional personnel manager]. I want the working environment to be more pleasant & have it understood that I'm here for one purpose my career both mine & the future of the company. I don't want this situation addressed without me but want to face it straight forward with Chuck Miller pres[e]nt at the time. Again Thank you for the use of our Open Door Policy.

Sincerely,

Kathy R. Moore

addendum-

I want it known that this is not a detailed statement of every single comment or action that has taken place regarding this situation nor does it intend to give any explicit details at this time if ever. This is only a general statement as to the nature of my complaint & the utilization of the open door policy to try & gain a resolution. I put my ultimate trust in [the] Company in Chuck & Missy & feel confident that this will be addressed 7 that I will have no fear of retaliation in regards to this issue.

(Muzingo Aff. Ex. E (ellipses in original).)

Chuck Miller and Jeff Wright requested a more detailed statement from Moore, and on May 1, 1996, she provided another written statement:

This statement is to notify you both & confirm our conversation regarding the

sexual advances made toward me while on duty here at 6423 Sam's Club by Ossie Gee, Co-manager. As I have told both of you Ossie has made both physical and verbal advances toward me while in the Club. The most serious of the incidents was a situation where we were in the Manager[']s office he shut the door, grabbed a hold of me tried to put my hand on him (private parts) and pulled me toward him & pushed me up against the file cabinet in a locking position. It was very obvious that he was sexually aroused. I pulled [a]way from him-VERY UPSET & told him not to ever do that[.] I also spoke with hin in regards to how I felt about "sexual comments," and/or advancements at work by anyone-hourly partners or management. I honestly cannot tell you why he though[t] he could do this to me. I have often times gotten the impression that he thinks everything is a joke. Our working relationship has been strange-He is either very flirty or tries to be very int[i]midating. The int[i]midating part only comes in front of hourly partners & one time in front of Missy he showed a defin[e]te lack of professionalism. Getting back to the sexual advances-I believe that all of it is a power-play.

I did confront him after having informed you both of the situation. I've tried to be and act professional but I have to say that it hasn't been easy. After having confronted him I did feel that things would be better but I don't think so under the circumstances. I understand that you must address this from a company position.

I believe in my heart that someone has already spoken with him!!-other than myself.

I don't feel very comfortable or trusting at this point.

I believe that he will be a Threat to me-

You don't or may not see that but you also didn't see him in that office which is exactly what I've tried to tell Missy.

This could be very serious and to be honest-anyone could have seen what he did to me in the office and also anyone could have heard us discussing it on the Night I confronted him. I want to be protected. I'm strong but under these circumstance I ask that you proceed with caution. I've certainly seen a different side of this man Ossie Gee & he knows that.

For what it is worth the best interest of all I don't think I should stay here in this club in Middletown. I thought this would be a little more discreet & I understand your point-and I hope that you understand mine. I also honestly believe that Ossie doesn't have much much [sic] regard for women or even Sam's Company Policy. Even in our conversation-in his apology there was an almost non concerning attitude.

It was only when I threatened to get Missy involved did he seem to care. (Muzingo Aff. Ex. F.)

Chuck Miller and Kent LaMont, Wal-Mart's regional loss prevention manager, interviewed Gee on May 3, 1996. During that interview, Gee denied having any non-consensual physical contact with Moore. (Def. 56.1 Stmt. ¶ 10.) He provided a written statement which said:

One evening at a party at Missy McKinley's House, Kathy Moore asked me to take her to get cigarettes. I told her that I didn't know what was open but we could see if there was a place open to get her some. As I was driving, Kathy started kissing on me, telling me how much she wanted me. She then straddled me while I was driving, still kissing me, causing me to almost drive off the road.

We pulled over in a parking lot and we both started in on each other to the point of almost having sexual intercourse. I drove Kathy back home and then went home myself.

One Saturday night while I was working an overnite Kathy called and started saying how she wanted to handcuff me in her basement and sit on my face. Another night we were talking and I made a comment about going into the POS room to kiss but was not serious about it, and did not do it. This comment came after we had discussed what we had done and that she liked it.

The last time came when we were in the Coaches office. She approached me and we both embraced. She suddenly backed away and then said how she wanted to keep things on a working level at work. I told her that I understood and that I respected her for that.

Since then I have not approached nor have I said anything out of line to Kathy. On Thursday April 25th while I was scheduled to close Kathy asked to talk to me in the Coaches office. She started saying that I had a negative attitude toward her and that I was taking it out on the night crew, because she wouldn't be with me. I was totally surprised that she would say something like that since she started this whole thing. I told her that I didn't work that way and that I have not said anything to her since the time in the office about what happened between us. I also told her that I regretted what happened and wished that it never did.

(Muzingo Aff. Ex. G.)

At the conclusion of the May 3, 1996, interview, notwithstanding Gee's denial that he had harassed Moore and without deciding that issue, Gee was immediately suspended "pending further investigation/decision as to discipline" because he had participated in a romantic relationship with a subordinate, which was deemed conduct unbecoming a Wal–Mart manager. (Def. 56.1 Stmt. ¶ 13.) Following his suspension, Gee left the Middletown store and did not return. (Id.) Moore does not recall ever seeing him again. (Id. ¶ 15.) On May 12, 1996, Gee was demoted to assistant manager and transferred to a store in New Jersey, as formal discipline for conduct unbecoming a manger. (Id. ¶ 14.)

Following Gee's suspension and transfer, Moore requested a transfer to a store in or near Sunrise, Florida, where she owned a home. (Id. ¶ 16.) On or about June 22, 1996, she was transferred to the Miramar, Florida, store, which is about a 25 minute drive from Moore's home in Sunrise. (Id. ¶ 17.) She was transferred with all expenses paid by Wal–Mart, and she was assigned the same merchandise manager position she held in Middletown, with the same material terms and conditions of employment, including the same salary and benefits, minus a cost of living adjustment. (Id. ¶ 18.)

Moore did not report to work at the Miramar store. (Id. ¶ 19.) She testified at her deposition that the reason she did not report was because she was afraid to introduce herself to the other employees. "I believed in the company. They didn't believe in me and I could not go in stating that they were a wonderful company when I did not believe that at the time." (Muzingo Aff. Ex. B at 145–46.) According to notes from her psychiatrist, Dr. Ken Sladkin, Moore told him, "On the day that she was supposed to start work, she drove off to work but then was unable to complete the drive to work. She described this as being freaked out. After that, she wound up in Miami, but did not know how she had gotten there." (Solomon Aff. Ex. I at 1.)

Moore is currently on inactive disability leave status with Wal–Mart. (Def. 56.1 Stmt. ¶ 19.) On July 9, 1996, Dr. Sladkin diagnosed her with acute stress disorder, anxiety disorder, and major depressive disorder. (Solomon Aff. Ex. I at 3.) On December 17, 1997, Dr. Leonard Gralnik diagnosed her with post-traumatic stress disorder, noting on a disability insurance claim form that she "cannot tolerate even minimal interpersonal stressors" and that she became unable to work due to that impairment in October, 1997. (Solomon Aff. Ex. L.)

At her deposition on June 10, 1998, Moore testified with respect to her car ride with Gee on the night of McKinney's party.

> I don't know where we were. I know there was a car lot. That's the only thing I remember about it...[Gee] said that he had always wanted me and he became very aggressive and started pulling my clothes off and he raped me. I begged him to stop. I fought with him and I ended up on the outside of the car with no clothes on begging him to take me home, begging him that I needed a cigarette. He continued to beg me, please, please like a child.
>
> Q. Please what?
>
> A. The man had just raped me. Obviously he didn't get enough. He begged me to have sex with him.

(Muzingo Aff. Ex. B at 98–99.) Moore was then asked if she had told any Wal–Mart employee, prior to her deposition, about being raped by Gee; she replied that she had told David Glass, Wal–Mart's CEO, via a faxed letter. That letter, dated September 15, 1996, stated:

> MR. GLASS,
>
> With all due respect, I must inform you that your Attorneys working for OSSIE GEE (STORE MGR) are wrong. Not only did he take me out into the middle of (who knows where) until I threatened to try & walk home. He PINNED ME to A *FILE CABINET* On the JOB. I can be FORCED TO GET MEDIA HELP. I have NO INSURANCE and my psychiatrist bills are astronomical. Yes, OSSIE GEE DID "MOLEST" me[.] He did TRY AT YOUR YOUR attorneys HAVE NO CLUE. I'll be happy to play I perfectly SOUNDED TAPE WHERE OSSIE "SAYS" I *Regret* I'm Sorry. He's SORRY AND I HAVE NO CAR[E]ER. BY THE WAY–I WAS with AND opened the BIRMINGHAM store IN *84*.
>
> How unfortunate that I put almost a Decade of my Life Into a once sought CAREER of which I Loved. I cannot

though AND will not deal with *SEXUAL* HARRASSMENT [sic].

> P.S. All GAY and Human Rights Love HATE *CRIMES*. Ossie Did hear me say I loved another woman a short few minutes Before we went to the store (never made it there)[.] There were no secrets of my SEXUAL Orientation!!!!
>
> He Lied–HE hurt me & he hurt my Relationship with WALMART with TONJA....AND He is a MGR. I don't want to Fight with you....But I will!! Nothing will stop me From Letting People Know the story so hope fully [sic] NO ONE else gets hurt. We can settle this IN OR out of court. It doesn't matter to me. I want to go ON[ ] with my Life.
>
> HE DID HARRESS [sic] & MOLEST ME. I should have called the Police while in the managers office. I told people *MANY* to watch out for me. I was scared of this man. But I am not AFRAID *ANYMORE*. WALMART ALLOWING This behavior. What would Mr. *Sam* think? GOD LOVE HIM.
>
> IF HE COULD ONLY HEAR "MY STORY."
>
> Mr. Glass, I understand you have you[r] attorneys. And I have mine. But also you have you[r] stock holders. The media & many many people that have high Regards for WAL–MART.
>
> Well I may Be a GAY WOMAN. But a good person who "ALWAYS" Proud TO Be a part of Wal–Mart. *HIGH EXPECTATIONS* "A[L]WAYS."
>
> Ask Chuck Miller, NANCY MOSS, SHRAN [sic] THOMAS, HANK GERLING.
>
> I WORKED HARD with You. In Middletown I taught culture. People finally knew that Sam was[n't] just a Face on a picture in the Break Room. I taught them who is was "A GOOD MAN" HUMBLE HONEST.

MR. GLASS I ask you now-what-just what and who do you believe. I WAS HURT!!!——>BADLY

Sincerely,

Kathy R. Moore

P.S. Still Suffering

CC ROSS SOLOMAN (Attor[n]ey At LAW)

(Solomon Aff. Ex. H.)

With respect to the alleged rape, Moore was also asked, "Why didn't you tell Missy McKinley when you spoke with her on April 25th?" and she answered, "because it took me two weeks or more just to get her to talk to me about the situation anyways." (Muzingo Aff. Ex. B at 100.) She also testified that she had told Sharon Thomas, a friend of hers who was general manager of a Wal–Mart store in Jacksonville, Florida, that Moore had been "sexually molested," but that she had not provided Thomas any more detail than that. (*Id.* at 117.) And she testified that she told her sister in Alabama about the rape the day after it occurred. (*Id.* at 102.) Additionally, Moore testified:

Q. Did you ever tell Missy McKinley that [Gee sexually molested you or sexually assaulted you]?

A. Yes.

Q. When did you tell her? Is it in [the] April 25th statement?

A. No, I told her in the office.

Q. What specifically did you tell her?

A. I told them that we were in the car and I told them that Ossie started pulling my clothes off, started tearing my clothes off of me. I told both Missy and Chuck that the same day, and then they asked me to write this and I did not, and as I said, I did not put in detail both of them that.

Q. You told them that and then they asked for a statement from you and you wouldn't put it in writing in terms of the detail you gave them verbally? Is that what you're saying?

A. That's right, I would not. I did not trust-no, I did not trust them. I did not trust Missy. I did not trust Chuck.

Q. If you were afraid to tell them this because you claim you didn't trust them or you were afraid of Mr. Gee, why did you tell them and then not put it in writing?

A. Well, I can't answer that. I don't know.

(*Id.* at 119.)

Finally, Moore testified with respect to her transfer to Florida that she

. . .was promised that I would have my own store by the end of June.

Q. June of 1996?

A. Let me back up. I was promised that I would become the marketing manager and that I could possibly have my own store by the end of June.

Q. Who promised you that you would become the marketing manager?

A. Missy McKinley and Chuck Miller.

Q. When did they make this alleged-

A. They wanted me to finish getting the store ready for the new regional manager, and I cannot remember her name. They wanted me to stay on the program on the night shift another two or three days to get the store prepared for a visit from our regional manager. Right after that I would be working days and I would be the marketing manager.

Q. Did you have a discussion with them after this evaluation wherein you told them you wanted to stay and be the marketing manager at the Middletown store?

A. I don't recall.

Q. But you do recall asking for a transfer, that you didn't want to stay in the store any longer?

A. No, I did not want to stay in the store.

Q. And you did ask for a transfer?

A. Yes.

Q. That you should have been transferred to a marketing manager's position somewhere?

A. Definitely.

Q. Did you specifically make that request?

A. Yes, I did.

Q. Who did you make it to?

A. Jeff Wright.

Q. What did Jeff tell you?

A. I would have to start over.

Q. Well, start over in the sense you would go down to Florida as a merchandise manager?

A. I would have to prove myself again.

Q. To become a marketing manager?

A. Right.

Q. Did he say why?

A. Did I ask why?

Q. Did you ask why?

A. Yes, I did.

Q. What did he say?

A. He said that's just the way it works.

Q. Did he elaborate on that?

A. Yes, he said that I could stay in the northeast region and continue on my career path, but if I moved out of his region, that I would have to start my career over.

Q. So the record is clear though, starting your career over didn't mean going back to a non-management position? You went down there as a merchandise manager, the same position you had in Middletown?

A. Right.

(Muzingo Aff. Ex. B at 151–54.) In a sworn affidavit, Chelle Moore, regional personnel manager for Sam's Clubs (and presumably of no relation to the plaintiff), stated that "assistant manager positions include an operations assistant manger, a merchandise assistant manager, and a marketing/sales assistant manager. All of the assistant manager positions are lateral positions and are the same salary range and all include the same benefit levels. Transfers between the assistant manager positions within an individual club are lateral transfers." (Wal–Mart Repl. Ex. A at ¶ 3.)

On November 19, 1996, Moore filed a charge with the EEOC alleging sexual harassment by Gee. The Complaint was timely filed on February 25, 1997. Discovery closed on August 18, 1998. On that date, Gee filed his motion for summary judgment with respect to the rape allegation and his Rule 12(c) motion. On August 20, 1998, the motion to amend the answer and Wal–Mart's motion for summary judgment were filed.[2]

**Discussion**

*Wal–Mart's Motion to Amend the Answer*

Wal–Mart moves to amend its answer to add a nineteenth defense:

Defendant, Sam's Club, a division of Wal–Mart Stores, Inc., exercised all reasonable care to prevent and promptly correct any sexually harassing behavior alleged by Plaintiff; and Plaintiff unreasonably failed to take advantage of the preventive and/or corrective opportunities provided by Defendant, Sam's Club, a division of Wal–Mart Stores, Inc., or to otherwise avoid the harm she alleges to have occurred.

This affirmative defense was specifically contemplated by the Supreme Court in two recent cases, *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2292,

---

**2.** The motion to amend the answer was docketed with the clerk on August 20, 1998. Counsel for Wal–Mart has stated that it was filed on August 6, 1998, with a return date of August 26, 1998. (Wal–Mart Mem. at 10 n. 5.) Though the Court received a courtesy copy on August 6, 1998, the actual date of docketing governs. The "return date" in this Court is a control date only. Counsel requested a return date of August 26, 1998, but as the Court noted in its August 11, 1998, memo endorsement of that request, oral argument was to be scheduled once the motion became fully submitted.

141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998), both decided on June 26, 1998. The plaintiff did not submit any opposition to Wal–Mart's motion. The motion is granted.

*Gee's Motion for Judgment on the Pleadings*

The Complaint contains six causes of action [3] against Gee in his individual capacity: sexual harassment in violation of Title VII [4]; sexual harassment in violation of the New York Human Rights Law; battery; false imprisonment; intrusion on seclusion; and intentional infliction of emotional distress. Gee argues that Moore cannot state a cause of action for the federal sexual harassment claim or the false imprisonment, intrusion on seclusion, and intentional infliction of emotional distress claims and that the Court should decline to exercise its supplemental jurisdiction over the state law sexual harassment and battery claims.

*Sexual Harassment in Violation of Title VII*

Gee argues, and Moore concedes, that an individual may not be held personally liable for sexual harassment under Title VII. *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir.1995). Thus, the first cause of action of the Complaint is dismissed as to Gee.

*Intrusion on Seclusion*

Gee argues and Moore concedes that New York does not recognize a common law claim for invasion of privacy such as intrusion on seclusion. Thus, the eighth cause of action is dismissed.

*Intentional Infliction of Emotional Distress*

Under New York law, to state a claim for intentional infliction of emotional distress, a plaintiff must allege four elements: (1) extreme and outrageous conduct by the defendant; (2) intent to cause severe emotional distress or disregard of a substantial probability of causing severe emotional distress; (3) severe emotional distress; and (4) causation between the conduct and the severe emotional distress. *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993). The elements are construed strictly. *Id.* The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

If Moore's allegations as stated in the pleadings are true, Gee's actions-not considering the alleged rape-were deplorable and reprehensible but do not rise to the level of extreme outrageousness as that phrase has been interpreted by the courts. *See, e.g., Burrell v. City University of New York*, 995 F.Supp. 398, 416 (S.D.N.Y.1998); *Silberstein v. Advance Magazine Publishers, Inc.*, 988 F.Supp. 391, 394 (S.D.N.Y.1997). The claim of rape, depending on the facts and circumstances of the alleged incident, could constitute intentional infliction of emotional distress. However, the plaintiff did not make such a charge until June 10, 1998, over two years after the event, and the statute of limitations for intentional infliction of emotional distress in New York is one year. *Foley v. Mobil Chemical Co.*, 214 A.D.2d 1003, 626 N.Y.S.2d 906, 907 (4th Dep't.1995); N.Y. C.P.L.R. § 215(3). Even if the Complaint could be construed as charging Gee with intentional infliction

---

**3.** The overall causes of action are enumerated in the Complaint as first, second, fourth, fifth, sixth, seventh, eighth and ninth; there is no "third" cause of action.

**4.** The Court does not read the Complaint as claiming a cause of action for retaliation (in violation of Title VII and/or in violation of New York Human Rights Law) against Gee in his individual capacity.

of emotional distress for an ongoing pattern of conduct, the specific events raised in Moore's Complaint must be independently actionable in order to allow evidence of other incidents which are otherwise barred by the statute of limitations. *Foley,* 626 N.Y.S.2d at 907; *accord Koster v. Chase Manhattan Bank, N.A.,* 609 F.Supp. 1191, 1198 (S.D.N.Y. 1985).

Thus, the ninth cause of action is dismissed.

*False Imprisonment*

■ Gee argues that the false imprisonment claim should be dismissed because Moore has not alleged "that she was threatened or intimidated, nor does she allege that the confinement, if any, lasted for any prolonged period of time." However, a plaintiff is not required to make those allegations in order to support a cause of action for false imprisonment. The elements of a cause of action for false imprisonment are: (1) the defendant intended to confine plaintiff; (2) the plaintiff was conscious of the restraint; (3) the plaintiff did not consent to confinement; and (4) the confinement was not otherwise privileged. *Parvi v. Kingston,* 41 N.Y.2d 553, 394 N.Y.S.2d 161, 163, 362 N.E.2d 960 (1977). "False imprisonment consists in [sic] the unlawful detention of the person of another, for any length of time, whereby he is deprived of his personal liberty." *Kajtazi v. Kajtazi,* 488 F.Supp. 15, 18 (E.D.N.Y.1978).

■ The Complaint alleges that Gee made "unwelcomed verbal remarks and physical contacts, including pulling her close to him and attempting to kiss her, pinning her against a filing cabinet, trying to place her hand on his genitals." (Compl.¶ 11.) From this it is reasonable to infer Gee's intent as well as Moore's consciousness and lack of consent. The Complaint further alleges that the confine-

ment was not otherwise privileged. (*Id.* ¶ 48.) Thus, the false imprisonment cause of action will not be dismissed.

*Supplemental Jurisdiction*

Though in *Tomka* the Second Circuit held that there is no employee liability under Title VII, the court did specifically endorse the position that an employee may be held personally liable for sexual harassment under the New York Human Rights Law. *Tomka,* 66 F.3d at 1317; *Storr v. Anderson School,* 919 F.Supp. 144, 148 (S.D.N.Y.1996).[5] Gee does not argue otherwise. Nor does he argue that Moore fails to state a claim of battery against him. Rather, he argues that since there are no federal claims remaining against Gee, the Court should decline to exercise its supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). Those claims are the New York Human Rights Law, battery, and false imprisonment claims.

■ However, this Court has jurisdiction over the state law claims based not only on supplemental jurisdiction but also on diversity jurisdiction. The events complained of occurred in this District, and the Complaint alleges that Moore is a citizen of Florida (Compl.¶ 3), that Gee is a citizen of New Jersey (*id.* ¶ 9), and that the amount in controversy exceeds $75,000. (*Id.* ¶ 5.) Thus the Court has jurisdiction pursuant to 28 U.S.C. § 1332. Since these claims against Gee may be all subsumed within plaintiff's claims against Wal–Mart under Title VII, it is appropriate that they be tried together.

*Motion for Summary Judgment as to Plaintiff's Allegation of Rape*

*Standard for Summary Judgment*

The Second Circuit has summarized the standards for granting summary judgment as follows:

---

**5.** The *Tomka* court based its reasoning on N.Y. Exec. Law § 296(6), which provides:

    It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the

acts forbidden under this article, or to attempt to do so.
Moore's Complaint does not rely on § 296(6) but only on § 296(1)(a), the section which imposes liability on employers.

First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Gallo v. Prudential Residential Svcs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### Gee's Motion

██ Whether Gee raped Moore is a disputed fact which, if proved to a jury's satisfaction, is material to the question of whether Gee sexually harassed her, rendering him liable as an individual under the New York Human Rights Law and, dependent upon the surrounding circumstances, could render Wal–Mart liable under Title VII.[6] Moore testified at her deposition that Gee raped her and that she told her sister about it the day after it occurred. (Muzingo Aff. Ex. B at 98–99; 102.)[7] This is enough evidence for a rea-

sonable jury to conclude that Gee did rape Moore.

██ Gee argues that the rape allegation should be dismissed for failure to comply with the notice pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. That rule requires the pleader to include in a pleading for relief a "short and plain statement of the claim showing that the pleader is entitled to relief." It is true that Moore's Complaint does not contain a factual or evidentiary allegation with respect to the incident in Gee's car and is confined to allegations concerning Gee's alleged conduct in the Middletown Sam's Club store. However, Moore's allegation of rape was not raised so late in the proceedings that it has irreparably prejudiced Gee. Gee cites *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1088–89 (10th Cir.1991), but in that case the plaintiff raised a new legal theory not contained in her complaint (failure to hire as opposed to retaliatory discharge). In contrast, here Moore has simply raised an additional factual allegation which could support the legal theory of sex discrimination already in her Complaint. Moreover, in *Evans* the plaintiff raised her new theory in her opposition to the defendant's motion for summary judgment; here, Moore raised the rape allegation during discovery. Her deposition was taken on June 10, 1998, and the discovery cutoff was August 18, 1998. Moore is granted leave to amend the Title VII and New York Executive Law claims in her Complaint to include sufficient factual allegations with respect to her claim of rape so as to comply with Rule 8(a)(2).

██ Gee contends that Moore is barred from raising the rape allegation because she did not assert it in her EEOC charge. For this he relies on *Butts v. City*

---

**6.** Gee cannot be liable for the alleged rape under Moore's battery theory. The statute of limitations for battery in New York is one year. N.Y. C.P.L.R. § 215(3). The rape is alleged to have occurred in March or April, 1996; though the Complaint was filed within a year, it did not contain the rape allegation, which would constitute a separate and dis-

tinct battery from the one charge in the Complaint.

**7.** She also testified that she told Missy McKinley "that Ossie started pulling my clothes off, started tearing my clothes off of me." (*Id.* at 119.)

*of New York Department of Housing Preservation and Development,* 990 F.2d 1397, 1401 (2d Cir.1993), which held that "A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Id.* at 1401 (citations omitted).[8] However, that statement is limited by another holding in *Butts* in which the Second Circuit noted that it has "allowed claims not raised in [an EEOC] charge to be brought in a civil action where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 1402 (citations and quotation marks omitted). If the EEOC had conducted an investigation of Moore's charge, it is reasonable to expect that her allegation of rape would have been raised, just as it was eventually raised when she was deposed. In plaintiff's deposition she maintained that the rape constituted a part of her overall claim of sex discrimination. Thus, the rape allegation will not be barred because it was not raised in Moore's EEOC charge and an amended complaint will not be futile for this reason.

Gee also argues that an amended complaint is futile because to allow Moore to litigate the rape allegation would result in undue prejudice to him. Moore delayed in giving notice to the defendants that her Complaint included an allegation of rape: the Complaint was filed on February 25, 1997, and she first raised the rape allegation on June 10, 1998. The longer an unexplained delay in putting a defendant on notice of a particular claim, the less prejudice a defendant must demonstrate in order to successfully dismiss the claim. *Block v. First Blood Associates,* 988 F.2d 344, 350 (2d Cir.1993). Gee may be prejudiced unless he is allowed to take additional discovery on the rape issue Following the plaintiff's deposition on June 10, 1995, counsel for Wal–Mart wrote to the Court on June 15, 1998, requesting an additional 30 to 60 days for discovery and to allow time for Gee to retain his own counsel. On June 17, 1998, the Court ordered Moore's counsel to respond by June 18, 1998. Mr. Solomon never responded. Gee did retain his own counsel who filed this motion on his behalf.

While there will be some prejudice to the parties in terms of cost and delay if discovery is reopened, Moore's allegation of rape is too serious and too closely connected to the overall tenor of her Complaint to be dismissed on the basis that she waited approximately 16 months to put the defendants on notice that she intended to make it a part of her sexual harassment claim. Psychologists recognize the existence of rape trauma syndrome, one symptom of which is delayed reporting by the victim of the rape. *See, e.g., People v. Bennett,* 79 N.Y.2d 464, 583 N.Y.S.2d 825, 830, 593 N.E.2d 279 (1992). Gee does not deny that he had a sexual interaction with Moore in his car on the night of McKinnley's party which Moore now contends was rape.

Moore will have 10 days to file an amended complaint, adding only a factual allegation of rape as she expressed it at her deposition on June 10, 1998. Gee shall have 60 days, from the date of the filing of the amended complaint, to conduct additional discovery on the new allegation added therein.[9]

**8.** Moore's Title VII claim against Gee as an individual is dismissed, *supra* at 13, and so the rape allegation would not be used as part of that claim. Rather, the pertinent issue is whether the rape allegation may be used as part of Moore's New York Human Rights Law claim against Gee as an individual. Gee relies on federal law in his argument on that issue. As New York courts rely on federal caselaw in expounding the Human Rights Law, the Court will do the same. *See infra* note 10.

**9.** Gee also raises a separate argument based on estoppel, but it is grounded in the same basis as his argument that he would be undu-

*Wal–Mart's Motion*

Wal–Mart offers two arguments for why the rape claim should be barred in plaintiffs' causes of action against it. First, it raises the *Burlington/Faragher* affirmative defense and argues that it should prevail on this defense as a matter of law. However, Moore's allegation of rape, properly construed, is not a separate cause of action subject to affirmative defenses but is an evidentiary fact which is potentially relevant to the sexual harassment causes of action. Thus, the *Burlington/Faragher* affirmative defense must be applied in that context. *See infra* at 190–95.

Second, Wal–Mart, like Gee, argues that the rape claim should not be heard because Moore did not raise it in her initial EEOC charge. As explained above with respect to Gee's motion, that argument fails.

However, because Wal–Mart, like Gee, would suffer prejudice if it were not permitted additional discovery on the rape issue, Wal–Mart shall also have 60 days, from the date of the filing of the amended complaint, to conduct additional discovery on the new allegation raised therein.

Though no further briefing on the rape issue shall be permitted, the defendants may file *in limine* motions prior to trial.

*Wal–Mart's Motion for Summary Judgment*

*Underlying Sexual Harassment Claims (Causes of Action 1 and 4)* [10]

Wal–Mart assumes for the purposes of its summary judgment motion that Moore has established a prima facie case of hostile work environment sexual harassment. (Wal–Mart Mem. at 10.) However, it argues that it is entitled to summary judgment because it prevails on its *Burling-*

*ton/Faragher* affirmative defense as a matter of law. That defense is based on the Supreme Court's holdings in *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998):

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. · When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second el-

---

ly prejudiced. It is not clear how, aside from the added cost and delay, Gee has been prejudiced by Moore's failure to raise the rape claim before her deposition.

**10.** New York courts rely on federal caselaw in expounding the Human Rights Law. *See, e.g.,*

*Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224, 1225 (2d Cir.1994); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992). Thus, the analysis for the Title VII and Human Rights Law causes of action, as against Wal–Mart, will be treated as one.

ement of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington,* 118 S.Ct. at 2270; *Faragher,* 118 S.Ct. at 2292–93.

■ As the Supreme Court noted, this defense is only available when the employer undertakes a tangible job action against the harassed employee, thus making the question of whether or not Moore suffered a tangible employment action a material issue of fact. That issue is in dispute. It is undisputed that Moore requested a transfer to Florida, but she and Wal–Mart dispute whether she was entitled to a marketing manager position once that transfer was completed. Jeff Wright told her that if she moved out of the northeast region, she would have to "start [her] career over," in the sense that she would have to begin in the same position that she had in Middletown, merchandise manager. (Muzingo Aff. Ex. B at 151–54.) However, Wright was Wal–Mart's regional personnel manager; Moore testified that Chuck Miller, Wal–Mart's director of operations, promised her that she would become marketing manager in Middletown and could possibly have her own store by the end of June. (*Id.*) The director of operations presumably is senior to the regional personnel manager and his statements may embody a company decision. A reasonable jury could conclude that in Wal–Mart's opinion Moore had earned a marketing manager position and that she was entitled to have that job title even when she transferred to

Florida. Moreover, according to Moore, Miller had promised her that she could switch to the day shift. (*Id.*) But when she was transferred to Florida she was assigned the night shift.

A more uncertain question is whether or not the marketing manager and merchandise manager positions are equivalent or if the marketing manager job represented a promotion for Moore. There is very little evidence on the record on this question.[11] A reasonable jury could conclude that even though Moore requested the transfer to Florida, that her assignment to a night shift merchandise manager position there represented an adverse, tangible job action.

Even if it were beyond dispute that Moore did not suffer an adverse tangible job action, the *Burlington/Faragher* affirmative defense appears not to be applicable in this case because the facts presented on this motion do not support the second prong of that defense. As to the first prong of the defense, the evidence does show that Wal–Mart "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Burlington,* 118 S.Ct. at 2270; *Faragher,* 118 S.Ct. at 2293. The record demonstrates that Wal–Mart had an "Open Door Policy" for receiving complaints of sex harassment, had no prior notice of sexually harassing conduct, and took prompt and complete remedial action in response to Moore's complaints. Moore first brought Gee's sexually harassing conduct to Wal–Mart's attention on April 25, 1996; her superiors asked her for a more detailed statement, which

11. Moore testified that her position in Florida was to be at the same salary as her position in Middletown. (Muzingo Aff. Ex. B at 144.) While the Court credits the affidavit of Wal–Mart's regional personnel manager for Sam's Clubs, Chelle Moore, who stated that the marketing manager and merchandise manager positions are equivalent, the statement is of little weight absent an official company job tree or other document. Moreover, merely because the positions may be considered equivalent by the company and may pay the

same salary does not mean that they are unequal in terms of prestige or opportunity within the organization. It is quite possible that the typical career path at Wal–Mart involves moving from merchandise manager to marketing manager and then on to a higher position and that moves from the marketing position to merchandise are rare. In other words, merchandise managers may not be promoted at the same rate as marketing managers.

she provided on May 1, 1996. After conducting an investigation pursuant to the company's sexual harassment policy, Wal–Mart suspended Gee on May 4, 1996. When the suspension ended on June 15, 1996, Gee was notified that he was demoted and was transferred to another location. (Muzingo Aff. Ex. C at 72–74.) Moore never saw Gee again, and he had no further control over her career at Wal–Mart. (*Id.* Ex. B at 156.) At her deposition Moore was unable to articulate what other action she wished Wal–Mart would have taken against Gee other than that Gee should never again be in a managerial position. (*Id.* at 154.) The fact that Gee was later re-promoted and became general manager of the Princeton store in December 1997 (*id.* Ex. C at 73) does not make Wal–Mart's handling of Moore's complaint unreasonable or render its remedy of her situation incomplete.

Moore's counsel argues that Wal–Mart's investigation was not reasonable because it did not investigate the car incident even though Moore's April 25, 1996 written statement to Wal–Mart said that "advancements were made" and expressed her fears of Gee [12] and even though Gee, in his May 3, 1996, written statement acknowledged a sexual encounter in his car in his statement to Wal–Mart's investigators. Even if true, there is nothing more Wal–Mart could have done to remedy Moore's situation with more disclosure from her, as even absent an investigation into the car incident Wal–Mart suspended, demoted, and transferred Gee.[13]

However, the second prong of the *Burlington/Faragher* defense does not apply here. This is not a case in which "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*, 118 S.Ct. at 2270; *Faragher*, 118 S.Ct. at 2293. *Burlington* was a case in which the plaintiff employee "did not inform anyone in authority about [her second-level supervisor's sexually harassing] conduct, despite knowing [the defendant employer] had a policy against sexual harassment," *Burlington*, 118 S.Ct. at 2262, and it appears that that is the sort of factual scenario to which the affirmative defense was designed to apply.

> An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have

---

**12.** Moore's counsel states that Moore's April 25, 1996 written statement "makes a clear reference to this incident" (Pl. Mem. at 7), but that reference is murky at best: "Around the end of March/beginning of April I attended a social gathering at the home of my GM [General Manager]. A situation derived from this night involving the Co-manager who was also at this party and myself. The boundary lines of a professional & personal relationship were overstepped-advancements were made. Nothing was mentioned to anyone else about this at this point to my knowledge or even discussed by the 2 of us." (Muzingo Aff. Ex. E.) Moore did testify at her deposition that she told McKinney verbally about the car incident. *See supra* note 7.

**13.** Moore's counsel says that it "would be unjust to rule against Plaintiff because she agreed to the Florida transfer, at a time when her ability to make decisions was severely effected [sic] by the fears and insecurities created by the ordeal in which she found herself." (Pl. Mem. at 7.) However, Moore requested the transfer herself. Though it would be beneficial for employers to be sensitive to the emotional state of their employees, there is no legal requirement that an employer who otherwise adequately remedies a hostile work environment nevertheless ignore the expressed wishes of the complaining employee because it believes her to be in a fragile emotional state.

been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided. *Faragher,* 118 S.Ct. at 2292.

Wal–Mart concedes that Moore "took full advantage of the preventive and corrective opportunities provided by Wal–Mart through its anti-harassment complaint procedures." (Wal–Mart Br. at 12.) She complained to her general manager verbally and then put her complaints in writing on April 25, 1996, and May 1, 1996. It is thus unclear how the *Burlington/Faragher* defense, on its own terms, would apply here.[14]

Wal–Mart cites two district court cases which have applied the *Burlington/Faragher* defense, but in each of them the plaintiff employee, unlike Moore, failed to take advantage of the defendant employer's harassment complaint procedures. *Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 487 (S.D.N.Y.1998); *Sconce v. Tandy Corp.,* 9 F.Supp.2d. 773, 778 (W.D.Ky. 1998). Additionally, Wal–Mart relies on *DeSilva v. Bluegreen Corp.,* No. 96 CV 683, 1997 WL 727523 (N.D.N.Y. Oct. 7, 1997), which is unpersuasive for two reasons. First, it predates *Burlington* and *Faragher* and thus is not useful for examining the applicability of the *Burlington/Faragher* affirmative defense. Second, it relies on an erroneous view of the law,

and the law has since been clarified by *Burlington* and *Faragher.* In *DeSilva* the court granted the defendant employer's motion for summary judgment because its "remedial action was reasonably calculated to eliminate harassment," relying on cases from the Third Circuit, the District of Kansas, the Southern District of Florida, and the District of the District of Columbia. *Id.* at *8–*9. As noted above, in *Burlington* and *Faragher* the Supreme Court did *not* adopt a negligence standard.

The *Burlington/Faragher* defense appears to be an effort by the Supreme Court to define a limited universe of cases in which employers will not be held strictly liable, on a vicarious basis, for the sexually harassing conduct of their supervisory employees. *See Faragher,* 118 S.Ct. at 2290–92. The Court noted that

in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here.

*Faragher,* 118 S.Ct. at 2290. In a footnote accompanying this text, the Court stated,

---

**14.** Wal–Mart's argument that it should prevail on the *Burlington/Faragher* affirmative defense is based not on the language of that defense as stated in the Supreme Court's decisions, but rather appears based on a negligence standard:

With respect to the second element of the affirmative defense, i.e., whether Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, there is simply no question in this case, at least as it relates to Plaintiff's April, 1996, complaint of harassment, that she took full advantage of the preventive and corrective opportunities provided by Wal–Mart through its anti-harassment complaint procedures and moreover, as a result of processing her complaint through Wal–Mart's procedures, all of her harassment

issues were, under any reasonable standard of review, resolved thereby. Under these circumstances, Wal–Mart cannot be held liable because it took prompt and wholly effective remedial action to end the alleged harassment.

(Wal–Mart Br. at 12–13.) However, as Justice Thomas pointed out in his dissent in *Burlington,* the Court did not adopt a negligence standard for hostile environment sexual harassment cases. Rather, as regards the actions of supervisory employees, "employers will be liable notwithstanding the affirmative defense, *even though they acted reasonably,* so long as the plaintiff in question fulfilled *her* duty of reasonable care to avoid harm," which Wal–Mart concedes Moore did in this case. *Burlington,* 118 S.Ct. at 2274 (Thomas, J., dissenting) (emphasis in original).

We say "starting point" because our obligation here is not to make a pronouncement of agency law in general or to transplant § 219(2)(d) into Title VII. Rather, it is to adapt agency concepts to the practical objectives of Title VII. As we said in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), "common-law principles may not be transferable in all their particulars to Title VII." *Id.* at 2290 n. 3. The Court went on to observe that *Meritor* held that "an employer is not automatically liable for harassment by a supervisor who creates the requisite degree of discrimination." *Id.* at 2291 (quotation marks omitted). To counter the tension between that holding in *Meritor* "and the position that a supervisor's misconduct aided by supervisory authority subjects the employer to liability vicariously," the Court established the *Burlington/Faragher* affirmative defense. *Id.* at 2291–93.

Thus, in cases in which the *Burlington/Faragher* defense is inapplicable, the Supreme Court appears to have held that a regime of strict liability of employers for the sexually harassing conduct of supervisors is appropriate, provided that the harassing supervisor's tortious conduct was "made possible by abuse of his supervisory authority." *Id.* at 2290. The Court relied on § 219(2)(d) of the Restatement (Second) of Agency which states, "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless...the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." [15] In this case, among other questions, it is an issue of fact for the jury to decide whether Gee "purported to act or to speak on behalf of [Wal-Mart] and there was reliance upon apparent authority, or he was aided in accomplishing [his acts] by the existence of the agency relation." [16]

### Retaliation Claims (Causes of Action 2 and 5) [17]

Wal-Mart argues that Moore is unable to establish a prima facie case of retaliation because there is no evidence of a tangible job action taken against her, which is an essential element of a retaliation claim. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996). But, as

**15.** It would appear then that the Supreme Court ratified the approach taken by the Second Circuit in *Karibian v. Columbia University*, 14 F.3d 773, 780–81 (2d Cir.1994), for cases in which the new *Burlington/Faragher* affirmative defense is inapplicable. In *Karibian* the Second Circuit, citing § 219 of the Restatement (Second) of Agency, held that "an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian*, 14 F.3d at 780. *But see Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir.1999) ("By promptly invoking a company's grievance procedure, a plaintiff has received the benefit Title VII was meant to confer. In such cases, an actionable hostile environment claim will rarely if ever have matured.").

**16.** As noted above, Wal-Mart assumed for the purposes of this motion that Moore had established a prima facie case of hostile work environment based on sexual harassment and thus it did not brief the question of whether Gee was aided by his supervisory relationship with Wal-Mart when he allegedly harassed Moore. The Court has therefore not analyzed the record to determine what evidence there may be which bears on this question. It does note, however, that at her deposition Moore testified, with respect to what she wished Wal-Mart had done in response to her complaints, that

> [H]e should not be a manager...I did not care what they did with him as long as he wasn't in control of other people's lives...I did not want him to have the power to do what he did to me in the car or to do what he did to me in the manager's office.

(Muzingo Aff. Ex. B at 156.)

**17.** The analysis of the federal retaliation claim is the same as that for the state law claim. *See supra* note 10.

noted above, this material fact is in dispute, albeit on a scant record. A reasonable jury could conclude that despite the fact that Moore herself requested a transfer to Florida that her assignment there to a night shift merchandise manager position was an adverse tangible job action, because she was entitled to day shift marketing manager position. Therefore, Wal–Mart's motion for summary judgment on the retaliation claims is denied.

### State Law Claims

Wal–Mart also moves for summary judgment on Moore's various state law tort claims. That motion is granted as to the intrusion on seclusion claim for the reason stated above, *supra* at 186, since New York does not recognize this claim. The motion is granted as to the intentional infliction of emotional distress claim for the reason stated above, *supra* at 186–87, that Moore has not alleged in a timely manner the level of extreme outrageousness by Wal–Mart required under New York law.

As for the claims of battery and false imprisonment, Wal–Mart argues that Gee's allegedly tortious conduct was not within the scope of his employment and that it is therefore not liable for his actions on a respondeat superior theory. In general, the intentional torts of employees related to sexual misconduct "arise from personal motives and do not further an employer's business, even when committed within the employment context." *Tomka,* 66 F.3d at 1318; *Ross v. Mitsui Fudosan, Inc.,* 2 F.Supp.2d 522, 531 (S.D.N.Y.1998). For this reason, and because Moore's counsel did not respond to Wal–Mart's arguments on the state law issue, summary judgment is granted to Wal–Mart on causes of action number six, seven, eight, and nine.

### Conclusion

For the foregoing reasons, Defendant Wal–Mart's motion to amend its answer is granted; Defendant Gee's motion for judgment on the pleadings on causes of action one (sexual harassment under Title VII), eight (intrusion on seclusion), and nine (intentional infliction of emotional distress) as against him as an individual is granted, but his motion for judgment on the pleadings on cause of action seven (false imprisonment) is denied; Gee's motion for summary judgment dismissing plaintiff's allegation of rape is denied; Wal–Mart's motion for summary judgment dismissing plaintiff's allegation of rape is denied; Wal–Mart's motion for summary judgment on causes of action one (sexual harassment under Title VII), two (sexual harassment under New York Human Rights Law), four (retaliation under Title VII), and five (retaliation under New York Human Rights Law) is denied; and Wal–Mart's motion for summary judgment on causes of action six (battery), seven (false imprisonment), eight (intrusion on seclusion), and nine (intentional infliction of emotional distress) is granted.

Moore will have 10 days to file an amended complaint, adding a factual allegation of rape as she expressed it at her deposition on June 10, 1998. Defendants shall have 60 days, from the date of the filing of the amended complaint, to conduct additional discovery on the new allegation added therein.

The clerk of the court shall enter judgment on behalf of Defendant Gee as an individual on causes of action one (sexual harassment under Title VII), eight (intrusion on seclusion), and nine (intentional infliction of emotional distress) and on behalf of Defendant Wal–Mart (and Gee in his representative capacity) on causes of action six (battery), seven (false imprisonment), eight (intrusion on seclusion), and nine (intentional infliction of emotional distress).

IT IS SO ORDERED.